**UNION CARBIDE CORPORATION,**
**Plaintiff–Appellant,**

v.

**EXXON CORPORATION, Defendant–**
**Counter–Claimant–Appellee.**

No. 269, Docket 95–7302.

United States Court of Appeals,
Second Circuit.

Argued Oct. 2, 1995.

Decided Feb. 29, 1996.

**678**

William C. Heck, Kelley Drye & Warren, New York City (Gerald P. Reidy, Assistant General Counsel, Union Carbide Corp., Danbury, Connecticut, Bud G. Holman, Jeffrey A. Jennes, Kelley Drye & Warren, New York City, on the brief), for plaintiff-appellant.

James H. Carter, Jr., Sullivan & Cromwell, New York City (John L. O'Hern, Exxon Chemical Co., Houston, Texas, Edward R. Gallion, Steven Spielvogel, Sullivan & Cromwell, New York City, on the brief), for defendant-appellee.

Before MESKILL, KEARSE and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Plaintiff-appellant Union Carbide Corporation ("Union Carbide"), appeals from a judgment of the United States District Court for the Southern District of New York (Preska, J.), granting summary judgment to defendant-appellee Exxon Corporation ("Exxon") with respect to all of Union Carbide's claims for relief. On appeal, Union Carbide contends that the district court erred in a number of respects, including finding as a matter of law that Exxon had not disclosed Union Carbide's Confidential Technical Information ("CTI"). For the reasons stated by the district court, we find all but Union Carbide's contention with respect to its CTI, to be unavailing. However, we hold that the district court erred in granting summary judgment with respect to the revelation of Union Carbide's CTI and remand the case to the district court to resolve the factual dispute.

## BACKGROUND

On May 12, 1981, Union Carbide entered into a Licensing Agreement (the "Agreement") with Exxon. Under the Agreement, Exxon purchased a non-exclusive license to utilize Union Carbide's CTI to facilitate the manufacture of high and low density polyethylene, two widely used, versatile forms of plastic. According to the terms of the Agreement, Exxon could extend its rights under the Agreement to its "Affiliates," namely any company of which 50% or more of its stock was controlled by Exxon.

In 1988, Exxon informed Union Carbide of its intention to build a polyethylene facility in Western Europe in consort with a yet undetermined partner chemical company. In exchange for the extension of its CTI, Union Carbide agreed to accept a $16.3 million lump-sum royalty payment, as well as running royalties on all plastic produced in the

new plant. In September of 1990, Union Carbide accepted an initial $1.4 million payment toward royalties on the Western Europe plant. Since that time, Exxon has paid further installments on the $16.3 million lump-sum royalty to Union Carbide.

In furtherance of Exxon's plans to begin producing plastic in Western Europe, Exxon's French affiliate Exxon Chemical Polymeres, S.N.C. ("Exxon Polymeres") entered into a business relationship with Shell Chimie, S.A. ("Shell Chimie"), an affiliate of the Royal Dutch Shell Group. Exxon Polymeres and Shell Chimie created a business entity entitled Compagnie Industrielle Des Polyethylenes De Normandie ("CIPEN"), the sole purpose of which was to own and operate a plastic manufacturing plant in Notre–Dame–De–Gravenchon, France.

CIPEN was structured as a Groupement d'Interet Economique ("GIE"), a form of business entity under French law resembling a partnership. Exxon Polymeres and Shell Chimie each controlled 50% of CIPEN's stock and jointly elected CIPEN's sole director. By agreement of its member corporations, CIPEN's sole pursuit was the manufacture of plastic from the raw material ethylene provided by Exxon Polymeres and Shell Chimie.

Beginning in September 1990, Exxon paid Union Carbide installments on the lump-sum royalty, and after manufacturing commenced in 1992, Exxon also paid Union Carbide running royalties on the polyethylene produced by its affiliated company, CIPEN. For more than four years, Union Carbide accepted the royalties without comment. On December 7, 1994, however, Union Carbide served Exxon with a written notice of default, asserting that Exxon had breached its Agreement with Union Carbide by improperly disclosing Union Carbide's CTI to Shell Chimie. The following day, Union Carbide filed this action against Exxon in the United States District Court for the Southern District of New York, asserting:

(1) breach of the Agreement by Exxon's granting sublicenses to Shell Chimie and Exxon Polymeres;

(2) breach of the Agreement by refusing to permit an audit of the books of account of CIPEN as required by the Agreement;

(3) breach of the Agreement by disclosing Confidential Technical Information to Shell Chimie and Exxon Polymeres;

(4) misappropriation and continuing use by Shell Chimie of Union Carbide's trade secrets;

(5) tortious interference with Union Carbide's prospective contractual relations with Shell;

(6) the right to a declaration of default by Exxon permitting Union Carbide to terminate the Agreement within ninety days; and

(7) the right to terminate all licenses granted to Exxon under the Agreement.

Exxon responded to Union Carbide's complaint by moving for summary judgment. The district court rejected all of Union Carbide's claims for relief and granted summary judgment in favor of Exxon.

In a thorough opinion, the district court first determined that CIPEN—a GIE under French law—was Exxon's "affiliate" within the meaning of the Agreement. Article I.18 of the Agreement defines an "affiliate" as "any *company* of which the designated party now or thereafter owns or controls, directly or indirectly, fifty percent (50%) or more of the stock having the right to vote for directors thereof." (emphasis added). The district court noted that both New York and federal law define "company" in a broad and inclusive manner. *See, e.g., In re American Cigar Lighter Co.,* 77 Misc. 643, 138 N.Y.S. 455, 456 (N.Y.Sup.Ct.1912) (company may include individuals and partnerships); *Keystone Pub. Co. v. Hill Dryer Co.,* 55 Misc. 625, 105 N.Y.S. 894, 894 (N.Y.City Ct.1907) (" 'company' may be employed equally well by a corporation, a partnership, or an individual doing business under a trade-name"); *see also Securities and Exchange Comm'n v. American Bd. of Trade, Inc.,* 751 F.2d 529, 536 (2d Cir.1984) (investment company includes " 'a trust, a fund, or any organized group of persons, whether incorporated or not' " (quoting Investment Company Act, 15 U.S.C. § 80a–2(a)(8) (1982))). Moreover, the district court determined that a broad defini-

tion of "company" was consistent with the language of the Agreement as a whole. Accordingly, the district court determined that "[g]iven the broad definition ['company'] has enjoyed in New York and the obvious broad reach intended by the parties for that term in the Agreement, no rational factfinder could find GIE not to be a 'company'." D.Ct. Op. at 14–15.

Second, the district court determined that CIPEN's production of plastic was fully within the scope of the Agreement. Union Carbide argued that Exxon was only authorized to manufacture plastic resins for the sale or use of those resins so manufactured. *See* Agreement, Arts. IV.1 and XV.1. By simply distributing the produced resins at no cost to its two shareholders for those shareholders then to sell, Union Carbide contended that CIPEN itself was neither selling nor using the plastic within the meaning of the Agreement. Nonetheless, looking to the context of the Agreement, the district court interpreted the term "use" to mean "use[ ] or otherwise dispose[ ] of." *See* Agreement, Art. I.30(b) (Net Sales Value). As Union Carbide itself acknowledged, "[t]he phrase 'otherwise disposed of ... but not sold' ... is intended to make express what was already implicit, that disposal of Resin without consideration is a use of Resin by Exxon...." D.Ct.Op. at 19 (internal citations omitted). Accordingly, the district court determined that CIPEN was making "use" of the resins by distributing them to its shareholders for their sale and was clearly acting within the scope of the Agreement in so doing.

Third, the district court considered Union Carbide's contention that Exxon had revealed Union Carbide's Confidential Technical Information in the course of its business relationship with Shell Chimie. Under Article XIV.1 of the Agreement,

Each party agrees to hold in confidence until five (5) years after the end of The Royalty Term all of the other party's Confidential Technical Information (as hereinafter defined) disclosed thereto under the Agreement-in-Principle and under this License Agreement, respectively.

In support of its motion for summary judgment, Exxon submitted declarations of Phi-

lippe Maisondieu (the "Maisondieu Declaration"), the Director of CIPEN, and Jean–Francois Berthiaux (the "Berthiaux Declaration"), an Exxon division Vice President, both of whom attested to the fact that Exxon had taken pains to protect Union Carbide's CTI. According to the district court, the Maisondieu and Berthiaux Declarations made clear that Exxon had never revealed any confidential information under the Agreement. Moreover, the district court held that Union Carbide's declarations were speculative and thus insufficient to rebut Exxon's showing that the CTI had been protected. According to the district court, Union Carbide's declarations stated that the CTI *might* have been revealed and accordingly did not create a genuine issue as to a material fact.

Fourth, the district court considered Union Carbide's contention that it had been denied the access to CIPEN's books that was required under the Agreement. *See* Agreement, Art. XVIII.6 ("Exxon ... shall from time to time permit Union Carbide ... to examine ... such books of account of Exxon...."). According to its declarations, on February 18, 1994, Union Carbide requested documents concerning "the terms of transfer of product from [CIPEN's] production facility to Shell and Exxon affiliates," Weiland Decl., Ex. 1, including "documentation specifying the nature of transactions (i.e. sold, contributed or otherwise) between [CIPEN] and Shell and Exxon affiliates, as well as pricing and delivery terms," *Id.* Because Exxon refused to give Union Carbide all the information it sought, Union Carbide asserted that Exxon was in violation of the Agreement. The district court determined, however, that Union Carbide had raised no issue of fact as to its access to CIPEN's books of account. Significantly, Union Carbide did not dispute that it was allowed to audit CIPEN's accounting information. Rather, Union Carbide contended that it was denied access to information concerning the relationship among CIPEN, Exxon Polymeres and Shell Chimie. In light of its prior determination that CIPEN was properly an affiliate acting within the scope of the Agreement, the district court determined that such information was not contemplated by Article XVIII.6

(quoted above). As the district court concluded:

> Since ... royalties on ... all of CIPEN's product, are determined on the basis of fair market value, none of the information requested by [Union Carbide] in its February 18, 1994 letter ... is relevant to the correctness or incorrectness of the statements rendered by Exxon within the meaning of Article XVIII.6. Accordingly, there is no genuine dispute of material fact with respect to the question of whether Exxon granted [Union Carbide's] independent auditors proper access to CIPEN's books of account, and summary judgment is proper for Exxon on this issue as well.

D.Ct.Op. at 39–40 (citations omitted).

Finally, the district court determined that Union Carbide's cause of action for tortious interference with prospective contractual relations was barred by New York's three-year statute of limitations. *See* N.Y.Civ.Prac.L. & R. §§ 202 and 214(4) (McKinney 1990). While Union Carbide argued that Exxon was estopped from asserting a statute of limitations defense because it misrepresented that CIPEN was a company within the meaning of the Agreement, *see Golden Budha Corp. v. Canadian Land Co. of America,* 931 F.2d 196, 200 (2d Cir.1991), the district court found that Exxon had fully divulged the nature of its transaction with Shell as early as 1990. Because Union Carbide could demonstrate no fraud or misrepresentation on the part of Exxon, the district court rejected Union Carbide's estoppel argument and dismissed the tortious interference cause of action on statute of limitations grounds.

In light of the rulings discussed above, the district court granted summary judgment to Exxon with respect to all of Union Carbide's claims for relief. Moreover, the district court declared that the Agreement was in full force and remained legally binding on all the parties.

## DISCUSSION

Union Carbide now appeals, contending that the district court erred in 1) finding CIPEN an "affiliate" within the meaning of the Agreement; 2) failing to find that CI-PEN's operations exceeded the authority granted it by the Agreement; 3) finding that Exxon had provided full access to CIPEN's books of account as required under the Agreement; 4) holding that the doctrine of equitable estoppel was inapplicable to Exxon's statute of limitations defense; and 5) determining that Exxon had not revealed Union Carbide's CTI to Shell Chimie. We have examined Union Carbide's first four contentions and find them to be unavailing for the reasons stated by the district court. With respect to Union Carbide's Confidential Technical Information claim, however, we find that the district court erred in granting summary judgment and remand to the district court to resolve the factual dispute.

We review the district court's grant of summary judgment *de novo. See Singer v. Fulton County Sheriff,* 63 F.3d 110, 114 (2d Cir.1995). In so reviewing the district court, we draw all reasonable inferences in favor of the non-moving party. *See Viola v. Philips Medical Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994). "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Gnazzo v. G.D. Searle & Co.,* 973 F.2d 136, 138 (2d Cir.1992); *see* Fed.R.Civ.P. 56(c).

In support of its grant of summary judgment concerning the CTI issue, the district court pointed to Exxon's declarations outlining the precautions undertaken by both CI-PEN and Exxon to protect all confidences. The Maisondieu and Berthiaux Declarations explicitly state that no Shell Chimie employee ever had access to Union Carbide's CTI. Maisondieu Decl. ¶¶ 4–6, 9; Berthiaux Decl. ¶ 12. Specifically, the declarations make clear that procedures had been implemented to shield all CTI from those Shell Chimie employees involved with CIPEN's affairs, even those individuals on CIPEN's Operating and Advisory Committees. *See id.* Moreover, while CIPEN's controller is necessarily a Shell Chimie employee under CIPEN's constitution, Exxon's declarations attest to the fact that the constitution explicitly restricts the controller's audit powers in such a way as to avoid the revelation of confidential information. Haigh Decl. ¶¶ 2, 4, 5, 6; Re-

nahy Decl. ¶¶ 2, 4, 5, 6. Standing alone, these declarations were more than sufficient to support summary judgment in favor of Exxon.

Nonetheless, it is clear from the declaration of Guy W. Bartlett (the "Bartlett Declaration"), the director of Union Carbide's Unipol Licensee Services, that a question of material fact exists as to whether Union Carbide's CTI has been revealed. Despite the district court's conclusion that Union Carbide's declarations fail to rebut the Maisondieu and Berthiaux Declarations directly, several of Bartlett's statements explicitly state that CIPEN has revealed CTI to Shell Chimie. *See* Bartlett Decl. ¶¶ 5, 6, 7, 8, 17, 18.

As an expert in the technical arcana of Union Carbide's proprietary polyethylene production process, Bartlett evaluated the technical information provided by CIPEN to Shell Chimie, as chronicled in Annex 2 of the Maisondieu Declaration. According to his assessment, Bartlett concluded, "from my knowledge of the technology and from the details required by Annex 2[,] these reports involve the disclosure of Union Carbide confidential technical information to Shell Chimie." *Id.* ¶ 11. Specifically, Bartlett states in his declaration:

> The data reported, in combination, provide material balances and energy balances around the CIPEN plant. For instance, Section 1.4 of Annex 2 reports the number of hours of operation, Section 1.5 reports feedstock consumption, yields of polyethylene by grade and chemical yields, and Section 1.6 reports the utilities consumption and yields for each grade of polymer and the chemicals consumption. *The material and energy balances achievable in a UNIPOL polyethylene plant* reflect the technology embodied in the plant and *is confidential technical information.* These material and energy balances are fingerprints indicative of horsepower and general size of the extrusion system, and catalyst consumption rates which in turn indicate catalyst productivity.

*Id.* ¶ 12 (emphasis added). Berthiaux and Maisondieu both submitted second declarations to counter Bartlett's assertions sug-

gesting that Shell Chimie ever received the Annex 2 information that Bartlett contends constitutes Union Carbide's CTI. *See* Second Berthiaux Decl., Second Maisondieu Decl. Bartlett's statements clearly present a factual conflict which should have been resolved by the district court in further proceedings. Moreover, while Berthiaux's second declaration suggests that Union Carbide itself has previously published "many of those parameters and operating conditions" chronicled under Annex 2, Second Berthiaux Decl. ¶ 4, it is clear that at least some of the parameters that Bartlett suggests embody Union Carbide's CTI have not been made public by Union Carbide. Accordingly, Exxon's and Union Carbide's competing declarations make clear that a genuine issue of material fact remains for the district court to resolve on remand.

## CONCLUSION

With respect to the revelation of Union Carbide's CTI, we reverse the district court's grant of summary judgment and remand for further proceedings. In all other respects, we affirm the opinion of the district court. The parties shall bear their own costs.