**UNITED STATES and State of New York ex rel. Xiomary Ortiz and Joseph Gaston, Plaintiffs,**

**v.**

**MOUNT SINAI HOSPITAL, Mount Sinai School of Medicine, and Mount Sinai Radiology Associates, Defendants.**

**13 Civ. 4735 (RMB)**

United States District Court, S.D. New York.

Signed May 16, 2017

Richard F. Bernstein, Timothy J. McInnis, Law Office of Timothy J. McInnis, Christopher Blake Harwood, United States Attorney's Office, New York, NY, Thomas Richard Fallati, Tabner, Ryan and Keniry, LLP, Albany, NY, for Plaintiffs.

Scott Roger Landau, Office of the General Counsel, Martin Tomas Murphy, Neil Stephen Binder, Wendy Helene Schwartz, Binder & Schwartz LLP, New York, NY, for Defendants.

## DECISION & ORDER

RICHARD M. BERMAN, U.S.D.J.

### I. Background

This Decision & Order resolves the summary judgment motion, dated October 19, 2016, of Mount Sinai Hospital, Mount Sinai School of Medicine, and Mount Sinai Radiology Associates (collectively, "Defendants"), to dismiss the claims of Xiomary Ortiz and Joseph Gaston (collectively, "Plaintiffs" or "Relators") under the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA") and the New York State False Claims Act, N.Y. State Finance Law §§ 187, et seq. ("NYSFCA").[1]

Mount Sinai Hospital provides, among other medical services, inpatient and outpatient radiology. (Defendants' Statement of Undisputed Material Facts, filed Oct. 19, 2016 ("Defs.' 56.1"), ¶ 1.) Plaintiffs' alle-gations in this action relate to billing for outpatient radiology services. (Id. ¶ 3.)

Between 2007 and 2011, Mount Sinai Radiology Associates had a Billing Department which submitted bills to Medicare and Medicaid for outpatient radiology services provided to patients. (Id. ¶ 2.) Plaintiff Ortiz worked in the Radiology Associates' Billing Department from early 2007 until early 2011. (Id. ¶ 16.) Plaintiff Gaston has not worked in the Billing Department. (Defs.' 56.1 ¶ 17.) On February 1, 2011, Mount Sinai outsourced the Radiology Associates' billing function (for outpatient radiology services) to McKesson Corp., a third-party billing service. (Id. ¶ 7.)

Daniel Dorce was the Billing Manager of Radiology Associates' Billing Department until he resigned in August 2010. (Defs.' Reply and Response to Relators' Counter-Statement of Material Facts, filed Dec. 16, 2016 ("Defs.' Reply 56.1"), ¶¶ 6, 40.) The parties agree that, during his tenure as Billing Manager, **"Dorce and other staff members created and used lists they called 'cheat sheets' for the purpose of identifying in advance which radiologists they would list on [Medicare and Medicaid] claims forms as the rendering physician—regardless of who the actual rendering physician was."** (Id. ¶ 13 (emphasis added).) Billing Department employees "were specifically instructed by Daniel Dorce to bill payers [such as Medicare and Medicaid] under a participating physician['s] name only."[2] (Schwartz Decl., filed Oct. 19, 2016, Ex. 17B at 2.) "So if a non-par[ticipating] physician had actually performed the procedure, [employees]

---

1. The United States and New York State governments declined to intervene with respect to the Relators' claims, but stated, "[t]he Government and the State of New York may seek to intervene with respect to the allegations in the relators' Complaint, for good cause, at any time." (Order, filed May 15, 2014, at 1–2.)

2. A physician is "participating" in Medicare and Medicaid if he or she has completed the process for enrolling with Medicare and Medicaid and performs services that Medicare or Medicaid will pay for. (See Defs.' 56.1 ¶ 10.)

were instructed not to utilize his/her name for billing purposes but to ... refer to [Dorce's] list and ch[oose] a participating physician and bill under his/her name." (Id.)

Defendants concede that, at Dorce's instruction, there were "instances in which Outpatient Radiology Billing ... misidentified staff radiologists on bills to Medicare or Medicaid, both rendering" radiologists (i.e. those who performed the radiological service) and "referring" or "ordering" radiologists (i.e. those who directed the patient to see another radiologist). (Defs.' 56.1 ¶ 34); see also id. ¶¶ 21–23; Hr'g Tr. before Magistrate Judge Moses, dated Aug. 18, 2016, at 49:25–50:5 (Defendants stipulated, for example, that "[t]he Mt. Sinai outpatient radiology Billing Department submitted claims to Medicaid that identified Drs. Jaime Lopez–Santini and David C. Thomas, as the referring physicians when the referral was provided by a different attending or teaching physician").

On March 3, 2011, the Mount Sinai School of Medicine voluntarily disclosed in a letter to the Office of the Medicaid Inspector General ("OMIG") that the Medicaid enrollment of two staff radiologists had (only) been pending at the time Medicaid was billed for their services, and that both doctors had been misidentified on the submitted claim forms. (Defs.' 56.1 ¶ 40.) The School of Medicine refunded Medicaid in the amount of $15,012.41 which had been paid by Medicaid even though these two doctors had not completed their enrollment in Medicaid. (Id. ¶ 41.) The letter to OMIG also stated in a footnote the following:

> [W]e also [have] identified claims where the Billers randomly substituted the name of one enrolled radiologist with the name of another enrolled radiologist when billing under the group number. Both the rendering radiologist and the listed radiologist were enrolled with the Medicaid Program. Accordingly, we have not included those claims in our refund calculations.

(Schwartz Decl., Ex. 3 at 2 n.1.)

The U.S. Medicare Program Integrity Manual is published by the Centers for Medicare & Medicaid Services, a Federal agency, and "establish[es] the roles and responsibilities of the various organizations or units responsible for ensuring the integrity of the Medicare program." (Relators' Mem. of Law in Opp. to Mot. for Summ. Judg., filed Nov. 18, 2016 ("Ps.' Mem."), at 12 footnote 6.) Section 4.2.1 of the Manual states, "The most frequent kind of fraud arises from a false statement or misrepresentation made, or caused to be made, that is material to entitlement or payment under the Medicare program." (McInnis Decl., filed Nov. 18, 2016 ("Medicare Integrity Manual"), Ex. 27 § 4.2.1.) A Manual example is "[m]isrepresentations of ... the identity of the ... individual who furnished the services." (Id.) CMS 1500, the health insurance claim form used by Medicare and Medicaid, requires the physician who signs the form to represent that: "In submitting this claim for payment from federal funds, I certify that: ... the services on this form were ... personally furnished by me." (McInnis Decl., Ex. 28.) Under the line, "**Signature of Physician (or Supplier)**," the individual is also directed to represent: "I certify that the services listed above ... were personally furnished by me." (Id. (emphasis in original).)

In addition to the instances of mischaracterization of the rendering and referring physicians mentioned above, Plaintiffs have identified seven (unchallenged) instances in which Radiology Associates' Billing Department: (1) submitted a claim to Medicare utilizing a billing code that overstated the diagnosis codes or the pro-

cedure codes ("upcoding"); [3] (2) billed for services not performed ("phantom billing"); [4] or (3) billed (two or more times) for the same service ("multiple billing").[5] (Defs.' Reply Mem. of Law. in Supp. of Defs.' Mot. for Summ. Judg., filed Dec. 16, 2016 ("Defs.' Reply"), at 11 & n.10.)

On November 3, 2010, Plaintiff Ortiz submitted to Defendants' Auditing Department a statement describing the Radiology Associates' Billing Department's practice of "switching" radiologists' names.[6] (Schwartz Decl., Ex. 17B at 2.) She contended that the "department was instructed ... by Daniel Dorce to bill for authorized procedures only and not what was actually done." (Id.) According to Defendants, the Auditing Department investigated Ortiz's allegations and "found instances in which [Radiology Associates' Billing Department] had misidentified staff radiologists on bills to Medicare or Medicaid." (Defs.' 56.1 ¶¶ 3, 34.) It also found, as noted supra p. 447, that "the Medicaid enrollment of two staff radiologists had been pending [but not approved] at the time Medicaid was billed for their services." (Id. ¶ 40.)

As noted above, Mr. Dorce resigned in August 2010. Supra pp. 446–47.

## Procedural Background

On November 12, 2014, Plaintiffs filed their Amended Complaint alleging that Defendants had "billed Medicare and Medicaid fraudulently and/or improperly for services purportedly provided by [Mount Sinai Radiology Associates]." (Am. Compl., filed Nov. 12, 2014, ¶ 57.) On December 17, 2014, Defendants filed a motion to dismiss all of Plaintiffs' claims. In its Decision & Order, dated November 9, 2015, the Court denied the Defendants' motion to dismiss, holding that Plaintiffs had pled their claims "with a high degree of specificity by alleging the particular details of a fraudulent scheme and identifying particular false claims for payment that were submitted to the government." (Decision & Order, dated Nov. 9, 2015, at 16, 28 (brackets and internal quotation marks omitted).) The Court also held that:

> [T]he "doctor swapping" allegations are material.... The Complaint alleges that the doctors who rendered the medical treatment in at least six of the "doctor-swapping" examples were not eligible to bill Medicare. "Swapping" the name of an eligible doctor for an ineligible one would have a "natural tendency to influence, or be capable of influencing, the payment or receipt of money."

---

3. For example, Plaintiffs have shown that Medicare was incorrectly billed for a CT scan of the pelvis with contrast. (Guzman Aff, filed Oct. 19, 2016, ¶ 14.) The procedure was described in the invoice to Medicare "as a CT scan of the pelvis with and without contrast." (Id.)

4. For example, Plaintiffs have shown that "Medicare was billed for CT scans of the chest and abdomen and also for a diagnostic mammogram that was not performed on the patient." (Guzman Aff. ¶ 41 (emphasis added).)

5. For example, Plaintiffs have shown that "CT scans of the chest and abdomen were begun on one day but were rescheduled and com-

pleted four days later," yet "[t]wo almost identical invoices were submitted in connection with these procedures." (Guzman Aff. ¶¶ 18–19.)

6. For example, Plaintiff Ortiz's statement said, "We were specifically instructed by Daniel Dorce to bill payers under a participating physicians['s] name only. So if a non-par[ticipating] physician had actually performed the procedure, we were instructed not to utilize his/her name for billing purposes but to in fact refer to our list and ch[oose] a participating physician and bill under his/her name. This was an everyday occurrence for all the years I was in this position." (Schwartz Decl., Ex. 17B at 2.)

(Id. at 21–22 (quoting U.S. ex rel. Feldman v. van Gorp, 697 F.3d 78, 95 (2d Cir. 2012)).)

On October 19, 2016, Defendants moved for summary judgment on all of Plaintiffs' claims. They argue, **(1)** "misidentification of a physician who is eligible to bill [hereinafter "Doctor Swapping"], without more, is not material to payment under the FCA [and NYSFCA] and does not give rise to a 'false' claim" (Mem. of Law. in Supp. of Defs.' Mot. for Summ. Judg., filed Oct. 19, 2016 ("Defs.' Mem."), at 15); **(2)** "Relators' claims regarding the switching of rendering staff radiologists are also foreclosed under the ... public disclosure bar [hereinafter "Public Disclosure Bar"] of the FCA and [NYSFCA]" (id. at 20); [7] **(3)** "Relators cannot identify any evidence that would allow a reasonable jury to conclude that any of [Defendants' seven] purported [billing code] errors [hereinafter "Billing Errors"] was intentional or knowing" (id. at 25); **(4)** Plaintiffs' claims "brought under the reverse false claims provisions of the FCA and the NYCFA [hereinafter "Reverse False Claims"] ... should be rejected, as they are redundant" (id. at 27 (internal citations omitted)); and **(5)** Plaintiffs "have not identified any specific instance [hereinafter "Plaintiff's Evidence of Specific Claims"] in which a referring physician was substituted for another referring physician on any specific bill submitted to Medicaid"; "any specific instance ... in which a referring physician was substituted for another referring physician on any claim submitted to Medicare"; or

any "specific instance in which a [rendering] radiologist was misidentified on a claim directed to Medicaid" (id. at 14 n.8, 19 (emphases omitted)).

On November 18, 2016, Plaintiffs filed an opposition arguing, among other things, that: **(1)** Defendants' falsification of the physician names in claims satisfies the materiality requirement because it would have a "natural tendency to influence, or potential capability of influencing, a payment decision" (Ps.' Mem. 7); **(2)** Defendants have failed to demonstrate that they disclosed (i.e. in their letter to OMIG referred to at p. 447 supra) the substance of Relators' fraud allegations because the letter "state[d] that the billers had 'randomly substituted' providers' identities, when the practice was intentional and systematic" (id. at 21); **(3)** Plaintiffs have shown that Defendants' billing code errors were intentional through testimony that billing code errors were "not ... unintentional mistake[s]" and through "Dorce's broad invocation of [his Fifth Amendment] privilege in the face of allegations that he orchestrated and directed the overbilling practices" (id. at 23–26); **(4)** Defendants' argument that Plaintiffs' reverse false claims are redundant "has no statutory basis" and "is at odds with the broad intent of the reverse false claims provision of the FCA" (id. at 27); and **(5)** Defendants have conceded that the Billing Department was "falsifying the identities of referring physicians" on Medicaid claims.[8]

---

**7.** Under the public disclosure bar, "[t]he court shall dismiss an action or claim ... if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed ... in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation ... unless the ... person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A).

**8.** Plaintiffs fail to respond to Defendants' assertion that Plaintiffs have not identified "any specific instance ... in which a referring physician was substituted for another referring physician on any claim submitted to Medicare," or "in which a [rendering] radiologist was misidentified on a claim directed to Medicaid" (id. at 13 n.7).

On December 16, 2016, Defendants filed their Reply, which argues, among other things, that Relators are not entitled to rely upon the Fifth Amendment because they "do not identify any specific questions regarding the alleged overbilling that Dorce declined to answer." (Defs.' Reply 11–12).

For the reasons stated below, Defendants' motion for summary judgment [# 195] is granted in part and denied in part.[9]

## II. Legal Standard

"Congress enacted the False Claims Act to create an incentive for civic-minded whistle-blowers, that is, insiders who put their personal employment or other interests at risk in order to vindicate the pecuniary rights of the United States." U.S. ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc., 186 F.Supp.2d 458, 464–65 (S.D.N.Y.), aff'd, 53 Fed.Appx. 153 (2d Cir. 2002). The Act "rewards those who bring wrongdoing to light." U.S. ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 18 (2d Cir. 1990) (ellipsis and internal quotation marks omitted).

Under the False Claims Act, a citizen acting on the United States' behalf may sue a person or entity for presenting "a false or fraudulent claim for payment" to the Government, using or making "a false record or statement" in order to receive payment from the Government, or fraudulently "conceal[ing] ... an obligation to pay ... money or property to the Government." U.S. ex rel. Lissack v. Sakura Glob. Capital Markets, Inc., 377 F.3d 145, 152 (2d Cir. 2004). The NYSFCA "follows" the federal FCA, and it is "appropriate" to look to the FCA when interpreting the NYSFCA. State ex rel. Willcox v. Credit Suisse Sec. (USA) LLC, 36 N.Y.S.3d 89, 90, 140 A.D.3d 622 (App. Div. 1st Dept. 2016).

"The basic summary judgment standard is that [u]ncertainty as to the true state of any material fact defeats the motion." United States v. Raymond & Whitcomb Co., 53 F.Supp.2d 436, 440 (S.D.N.Y. 1999). "[T]he presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion." U.S. ex rel. DeCarlo v. Kiewit/AFC Enterprises, Inc., 937 F.Supp. 1039, 1042 (S.D.N.Y. 1996). Where "competing declarations make clear that a genuine issue of material fact remains," summary judgment is inappropriate. Union Carbide Corp. v. Exxon Corp., 77 F.3d 677, 682 (2d Cir. 1996).

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Universal Health Servs., Inc. v. U.S. ex rel. Escobar, —— U.S. ——, 136 S.Ct. 1989, 1996, 195 L.Ed.2d 348 (2016). Where there is a disputed issue of fact as to the materiality element under the False Claims Act, courts deny a defendant's motion for summary judgment. See U.S. ex rel. Feldman v. Van Gorp, 674 F.Supp.2d 475, 481 (S.D.N.Y. 2009).

"[T]here have been numerous cases imposing FCA liability, and even criminal false claims liability, based on violations of Medicare manual provisions." In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318, 351 (D. Conn. 2004). Where a claim form's "instructions ... provide[ ] ... a clear understanding of what information the [Gov-

---

9. The Court is not here ruling upon the ultimate merits of Plaintiffs' claims. It is concluding (only) that some of Plaintiffs' claims are eligible to be resolved by a jury.

ernment] considers in evaluating [the forms]," and defendants failed to provide such information, "a reasonable jury [could] conclude that had the facts been disclosed they would have had a natural tendency to influence, or would have been capable of influencing, the decision to ... pay money to the defendants." U.S. ex rel. Feldman v. van Gorp, 697 F.3d 78, 96 (2d Cir. 2012).

■■■■ Where it is appropriate to draw an adverse inference from a witness's invocation of the Fifth Amendment, the defendant can be "found to have acted with the requisite scienter." S.E.C., v. Glob. Telecom Servs., L.L.C., 325 F.Supp.2d 94, 118 (D. Conn. 2004). A "blanket claim of Constitutional privilege" is "impermissible." Estate of Fisher v. C.I.R., 905 F.2d 645, 649 (2d Cir. 1990). Instead, a witness "invoke[s] the privilege in response to specific questions." Id.

## III. Analysis

### (1) Doctor–Swapping

Defendants argue that "misidentification of a physician who is eligible to bill, without more, is not material to payment under the FCA [and NYSFCA] and does not give rise to a 'false' claim." (Defs.' Mem. 15.) They rely principally upon the decision in United States ex rel. Rockey v. Ear Inst. of Chicago, LLC, 92 F.Supp.3d 804 (N.D. Ill. 2015), in which the court held that failure to use physicians' correct National Provider Identification numbers "could not have influence[d] the payment or receipt of money by the government because the government would have paid the claim regardless of whose NPI was on the form. It follows that the alleged falsity of those claims was not material." Id. at 822.

Plaintiffs counter (persuasively) that Defendants' falsification of the physician names on claim forms may satisfy the standard of materiality because it may have a "natural tendency to influence, or potential capability of influencing, a payment decision." (Ps.' Mem. 7.) Plaintiffs cite to evidence suggesting that Medicare and Medicaid would have declined payment if they had known of Defendants' misrepresentation, including the testimony of Michelle Hozempa, a Claims Manager at National Government Services ("NGS"), a Medicare Administrative Contractor, and of Jessica Lourinia; Provider Outreach Representative at Computer Sciences Corporation, a company which processes claims for payment by for New York State Medicaid. (Id. at 8–11.)

Michelle Hozempa submitted a declaration, dated August 24, 2016, stating,

NGS has no knowledge as to whether Mt. Sinai Radiology Associates submitted claims in which it knowingly misrepresented the identities of rendering providers. To the extent those factual allegations are true, however, and had NGS been aware of the knowing misrepresentation of the identities of the rendering providers, then under then-existing policies, practices, and procedures, the claim would not be payable, and might also be referred by NGS to a [Zone Program Integrity Contactor ("ZPIC") ] or other government agency for further investigation.

(Schwartz Decl., Ex. 46 ("Hozempa Decl.") ¶ 8 (emphasis added).)

Jessica Lourinia gave similar testimony about Medicaid's practices at her deposition held on August 4, 2016:

Q: Who would actually receive the money in case of a mistaken NPI, but a valid NPI?

A: ... [T]he individual provider, ... that provider would receive the payment.

Q: They would receive it in error?

A: They would receive the payment in error, correct.

Q: Is there any procedure in place for what providers are supposed to do if that happens?

A: If the provider or provider's billing office, whoever is doing their bookkeeping, realizes that there is something incorrect on the payment, they are able to contact the Medicaid call center, notify us that a claim was paid in error, and one of our business analysts would look at the claim and see if there is a way for us to reverse it or if we would need the provider themselves [to] void out the claim.

(McInnis Decl., Ex. 29 at 78:12–79:5.)

 In assessing materiality, courts look to "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." U.S. ex rel. Grabcheski v. Am. Int'l Grp., Inc., 687 Fed.Appx. 84, 87, 2017 WL 1381264, at *2 (2d Cir. Apr. 18, 2017) (internal quotation marks omitted). In this case, Plaintiffs have introduced sufficient evidence to raise material issues of fact that Defendant's alleged misrepresentations would have influenced the payments made by Medicare and Medicaid. See id.; United States ex rel. Johnson v. Golden Gate Nat'l Senior Care, L.L.C., 223 F.Supp.3d 882, ——, 2016 WL 7197373, at *5 (D. Minn. Dec. 9, 2016); United States v. Dynamic Visions, Inc., 216 F.Supp.3d 1, 15–17 (D.D.C. 2016); United States v. Kellogg Brown & Root Servs., Inc., 800 F.Supp.2d 143, 159–60 (D.D.C. 2011).

The Court's Order, dated October 6, 2016, which denied Plaintiffs' objection to Magistrate Judge Barbara C. Moses's decision "den[ying] Plaintiffs' request for another DOH deposition," characterized Ms. Lourinia's testimony as indicating "that where payment claims misstate the identities of healthcare providers, ... DOH would deny payments or, if they had already been processed, 'reverse' them or ask 'the provider themselves to void out the claim[s].'" (Order, filed Oct. 6, 2016, at 1–2.) Testimony similar to the testimony of Ms. Lourinia and Ms. Hozempa has been found sufficient to defeat a defendant's motion for summary judgment in a case alleging that the defendants had "submitted fraudulent claims to D.C. Medicaid for home health care services not rendered or not authorized." See Dynamic Visions, 216 F.Supp.3d at 7–8 (where "the Medicaid Director of the District of Columbia Medicaid Program[ ] state[d] [in a declaration] that 'the failure to obtain proper authorization ... would result in denial of reimbursement'"); see also Kellogg Brown, 800 F.Supp.2d at 159–60 (where the Government "contend[ed] that it rejected ... claims as soon as it recognized that they contained unallowable ... costs").

As stated at pp. 450–51 supra, there have been numerous cases imposing FCA liability, and even criminal false claims liability, based on violations of Medicare manual provisions. Cardiac Devices, 221 F.R.D. at 351. Plaintiffs also point out that Section 4.2.1 of the Medicare Program Integrity Manual provides that "[t]he most frequent kind of fraud arises from a false statement or misrepresentation made, or caused to be made, that is material to entitlement or payment under the Medicare program." (Medicare Integrity Manual § 4.2.1.) And, as noted, an example in the Manual is "[m]isrepresentation[ ] of ... the identity of the ... individual who furnished the services." (Id.) The Manual lists as a (separate) example of fraud, "[a]ltering claim forms ... to obtain a higher payment amount" from Medicare. (Id.) These Manual provisions support the argument that stating the correct physician's name is material to payment from Medi-

care. See Cardiac Devices, 221 F.R.D. at 351.

Plaintiffs, as noted at pp. 447–48 supra, also cite to CMS 1500, the claim form used by Medicare and Medicaid which requires the physician who signs the form to represent that: "In submitting this claim for payment from federal funds, I certify that: ... the services on this form were ... personally furnished by me." (McInnis Decl., Ex. 28.) Under the line, "**Signature of Physician (or Supplier)**," the individual also is directed to represent: "I certify that the services listed above ... were personally furnished by me." (Id. (emphasis in original)). Where, as here, a claim form's instructions provide a clear statement of what information the Government considers in evaluating the forms, and defendants have not provided such information, "a reasonable jury [could] conclude that had the facts been disclosed they would have had a natural tendency to influence, or would have been capable of influencing, the decision to ... pay money to the defendants." Feldman, 697 F.3d at 96.

The case cited at p. 451 supra and relied upon by Defendants, Rockey, 92 F.Supp.3d 804, is distinguishable from the instant case. The plaintiffs in Rockey alleged, as do Plaintiffs here, that the defendants "regularly present[ed] reimbursement claims to Medicare for services rendered ... using [the wrong] physician's name." Id. at 810. However, unlike the instant case, the Medicare contractor in Rockey "agreed not to require [Defendants] to refund and resubmit the services ... billed under [the wrong] physician[.]" Id. at 811. The court in Rockey concluded that, because the government had agreed it would have paid the claim "regardless," "[i]t follow[ed] that the alleged falsity of those claims was not material." Id. at 822. Here, the Medicare contractor's representative testified that, had the contractor been aware of the knowing misrepresentation, "the claim would not be payable." (Hozem-

pa Decl. ¶ 8.) The Court cannot conclude at this stage that "the alleged falsity of [Defendants'] claims was not material." See Rockey, 92 F.Supp.3d at 822.

Plaintiffs' evidence raises issues of material fact whether Medicare and Medicaid, if they had known of Defendants' practices, would have required a refund. See Grabcheski, 687 Fed.Appx. at 87–88, 2017 WL 1381264, at *2. Plaintiffs' claims that Defendants submitted false claims or created false documents (31 U.S.C. §§ 3729(a)(1), (2) (now §§ 3729(a)(1)(A), (B)); N.Y. Fin. Law §§ 189(1)(a), (b)) by switching rendering radiologists' names on Medicare claims and switching referring radiologists' names on Medicaid claims survive Defendants' summary judgment motion.

### (2) Public Disclosure Bar

Defendants argue that "Relators' claims regarding the switching of rendering staff radiologists are ... foreclosed under the ... public disclosure bar of the FCA and [NYSFCA]." (Defs.' Mem. 20.) Defendants rely upon their March 3, 2011 letter to OMIG, which, as noted, stated,

[W]e also [have] identified claims where the Billers randomly substituted the name of one enrolled radiologist with the name of another enrolled radiologist when billing under the group number. Both the rendering radiologist and the listed radiologist were enrolled with the Medicaid Program. Accordingly, we have not included those claims in our refund calculations.

(Schwartz Decl., Ex. 3 at 2 n. 1.)

Plaintiffs counter that Defendants cannot invoke the public disclosure bar because, among other things, Defendants failed to disclose in their letter to OMIG the substance of Relators' fraud allegations. (Ps.' Mem. 21.) Plaintiffs' position is that the Defendants' letter "state[d] that

the billers had 'randomly substituted' providers' identities, when the practice was intentional and systematic." (Id.) Plaintiffs also argue that "transmission of a voluntary disclosure letter to OMIG" is insufficient because the FCA requires that there is "some affirmative act of disclosure to the public **outside** the government." (Id. at 19 (emphasis added).)

■ Defendants have not shown at the summary judgment phase that their letter, dated March 3, 2011, to OMIG was a "public disclosure" within the meaning of the FCA. See U.S. ex rel. Kester v. Novartis Pharm. Corp., 43 F.Supp.3d 332, 357 (S.D.N.Y. 2014); U.S. ex rel. Wood v. Allergan, Inc., 246 F.Supp.3d 772, 789–90, 2017 WL 1233991, at *7 (S.D.N.Y. Mar. 31, 2017). For one thing, Defendants' letter does not appear to have fully and accurately described the Mount Sinai Billing Department's conduct when they state in a footnote that "we also [have] identified claims where the Billers randomly substituted the name of one enrolled radiologist with the name of another enrolled radiologist when billing under the group number." (Schwartz Decl., Ex. 3 at 2 n.1 (emphasis added).) On another occasion, Defendants appear to have acknowledged that Dorce's (and the Billing Department's) conduct was not "random" but rather was intentional. (Defs.' Reply 56.1 ¶ 13 ("Dorce and other staff members created and used lists they called 'cheat sheets' for the purpose of identifying in advance which radiologists they would list on [Medicare and Medicaid] claims forms as the rendering physician— regardless of who the actual rendering physician was.").) The public disclosure bar applies "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." 31 U.S.C. § 3730(e)(4)(A). Where, as here, "the crux" of the relator's allegations are

that the defendants were engaged in a fraudulent scheme, but the disclosure cited by the defendants "contain[s] no suggestion of wrongdoing," it has been held that "the Relator's allegations … are not 'substantially similar' to prior public disclosures." Kester, 43 F.Supp.3d at 357.

■ And, as Plaintiffs point out, "the [public disclosure] bar applies only where there has been a disclosure outside of the government." Wood, 246 F.Supp.3d at 789, 2017 WL 1233991, at *7 (emphasis in original). Defendants' submission of a letter (only) to OMIG, in the circumstances presented here, is insufficient to invoke the public disclosure bar. See id.

Thus, Plaintiffs' claim that Defendants submitted false claims or created false documents (31 U.S.C. §§ 3729(a)(1), (2) (now §§ 3729(a)(1)(A), (B)); N.Y. Fin. Law §§ 189(1)(a), (b)) by using a "cheat sheet" to switch rendering radiologists' names on Medicare claims survives Defendants' summary judgment motion.

### (3) Billing Errors

Defendants argue that Relators cannot identify any evidence that would allow a reasonable jury to conclude that seven purported billing errors were "intentional or knowing." (Defs.' Mem. 25.) They cite the testimony of Vadesa Guzman, who worked in the Radiology Associates' Billing Department and was responsible for Medicare coding from approximately 2008 until 2011. (Id.) On October 19, 2017, Ms. Guzman submitted an affidavit stating that she was "responsible" for five of the seven errors. (Guzman Aff. ¶¶ 15, 20, 28, 42, 46.) And, based upon her review of documents and her familiarity with billing, Ms. Guzman concluded that all of the (seven) errors were "not intentional" (id. ¶¶ 3, 15, 20, 24, 28, 38, 42, 46), as follows:

1. "The billing error was not intentional on my part, and I was not aware

of any error at the time the charges were entered.... [T]he error was caused by a data entry error or a misreading of the radiologist's report." (Id. ¶ 15.)

2. "The billing error was not intentional on my part, and I was not aware of any error at the time the charges were entered.... [T]he error was caused by confusion over the rescheduling of the examination, which resulted in the submission to the billing department of two different ... forms on two different days for the same scheduled exam, leading me inadvertently to enter the same charges twice." (Id. ¶ 20.)

3. "I was not responsible for the coding and charge entry of these procedures. Based on my review of the documents and my familiarity with this type of billing, the billing error resulted from confusion over ... consecutive dates of service," i.e. "an MRI of the brain was performed on one day and MRIs of the cervical and thoracic spine were performed the following day on the same patient." (Id. ¶ 24.)

4. "The billing error was not intentional on my part, and I was not aware of any error at the time the charges were entered.... [T]he billing error resulted from a data entry error or a misreading of the radiologist's report." (Id. ¶ 28.)

5. "I was not responsible for the coding and charge entry of this procedure. Based on my review of the documents and my familiarity with this type of billing, the billing error resulted from a data entry error or a misreading of the radiologist's report." (Id. ¶ 38.)

6. "The billing error was not intentional on my part, and I was not aware of any error at the time the charges were entered.... [T]he billing error was caused by my ... inadvertent entry of charges for two different patients under the same patient number." (Id. ¶ 42.)

7. "The billing error was not intentional on my part, and I was not aware of any error at the time the charges were entered.... [T]he billing error resulted from a lack of awareness on my part ... that an earlier, partial invoice had been generated." (Id. ¶ 46.)

Ms. Guzman also denied at her deposition on May 6, 2016 that she "ever intentionally bill[ed] Medicare twice or more for the same service"; that she "ever intentionally bill[ed] Medicare for services that were not performed"; or that she "ever intentionally overstate[d] a procedure code in order to get Medicare reimbursement at a higher rate." (Schwartz Decl., Ex. 23 ("Guzman Dep."), at 153:25–155:2.) Ms. Guzman also denied that "anyone ever instruct[ed] [her] to do so," i.e. to bill Medicare "twice or more for the same service," "for services that were not performed," or for an "intentionally overstate[d] ... procedure code." (Guzman Dep. 154:5–7, 154:17–19, 155:4–8.)

Plaintiffs dispute Ms. Guzman's testimony that the errors were unintentional based upon an affidavit submitted by Plaintiff Ortiz, who, as noted, was a "Financial Specialist in the billing department," and who performed billing functions in Outpatient Radiology "in close physical proximity to [Ms. Guzman]." (Reply 56.1 at 2, ¶¶ 2, 8.) Plaintiff Ortiz "had near daily contact and conversations with [Ms. Guzman]" about Medicare billing. (Id. ¶ 9.) Plaintiff Ortiz also reviewed the seven erroneous bill statements and concluded that each error was "not an unintentional mistake." (Ortiz Aff., filed Nov. 18, 2016, ¶¶ 52–55, 57–59.)

1. "The procedures in question included a 'dual phase' examination, and Dorce instructed the staff to bill all dual-phase exams as with and without contrast.... Based on the content of the report and the general instructions from Dorce, this instance of upcoding was deliberate." (Id. ¶ 52.)

2. "Based on the fact that there is only one report in the record, Ms. Guzman likely knew she was double billing." (Id. ¶ 53.)

3. "According to the [doctor's] narrative report, only one procedure was done, on January 8, 2008. It is not confusing.... The audit trail ... shows that no one looked at the report before the service was billed. Based on these facts, this was not an unintentional mistake." (Id. ¶ 54.)

4. "The [doctor's] narrative report shows one procedure, done on April 6, 2010. Based on the report, ... this was not an unintentional mistake." (Id. ¶ 55.)

5. "[T]he audit trail shows that no one looked at the narrative report between the time it was signed by Dr. Keller on March 15, 2007 and when I accessed it on January 14, 2011. Based on ... the fact that the report was not viewed by Ms. Guzman (or anyone else) for billing purposes, the overbilling was not an unintentional error." (Id. ¶ 57.)

6. "The audit trail shows that Ms. Guzman accessed the [doctor's narrative] report on February 20, 2009 .... Based on the fact that there is only one report in the patient's record, which is for an exam of the chest and abdomen and does not mention a mammogram, and which Ms. Guzman accessed only once, she likely knew that she was billing for a service that was not performed." (Id. ¶ 58.)

7. "[I]t was Ms. Guzman who entered the earlier charges: according to the audit trail, she posted charges for the October 28 exam on November 3 and again on November 9, 2010, but she accessed the [doctor's narrative] report only once, on November 9. Based on this fact, Ms. Guzman likely knew that she had billed twice for some parts of the exam." (Id. ¶ 59.)

Plaintiffs also argue that "[f]urther evidence of Defendants' intentional conduct arises from the fraudulent practices aimed at private insurers." (Ps.' Mem. 25.) They cite the testimony of Ms. Bibi Kahn, who "was responsible for charge entry, including for Medicare and Medicaid" (Reply 56.1 ¶ 18), that Dorce instructed her "[t]o bill whatever was authorized ... [f]or the commercial insurance" rather than bill commercial insurers for the provided service. (McInnis Decl., Ex. 9 ("Kahn Dep.") at 160:16–24.). Plaintiffs also contend that, "[g]iven Dorce's broad invocation of [his Fifth Amendment] privilege in the face of allegations that he orchestrated and directed the overbilling practices, an adverse inference is readily warranted" that Defendants acted intentionally. (Ps.' Mem. 22, 24.)[10]

10. At his deposition on June 2, 2016, Dorce was asked by Plaintiffs' counsel, "Other than answering the basic background questions as to name and education and so on, is it your intention to assert the Fifth with respect to any question that I ask you today?" (McInnis Decl., Ex. 18 ("Dorce Dep.") at 15:17–20.) Dorce answered, "Yes," whereupon Plaintiff's counsel terminated the deposition. (Id. at 15:21–22.)

The Court agrees with Defendants that no adverse inference can be drawn from Dorce's invocation of the Fifth Amendment, see Fisher, 905 F.2d at 649 (A "blanket claim of

■ Where, as here, "competing declarations make clear that a genuine issue of material fact remains," summary judgment is inappropriate. Union Carbide, 77 F.3d at 682; see also Eastman Mach. Co. v. United States, 841 F.2d 469, 474 (2d Cir. 1988); MacQuesten Gen. Contracting, Inc. v. HCE, Inc., 191 F.Supp.2d 407, 409 (S.D.N.Y. 2002). The affidavit and deposition testimony submitted by Defendants clearly conflicts with Plaintiff Ortiz's affidavit and Ms. Kahn's testimony. Disputed issues of material fact as to Defendants' intent are presented. See Eastman, 841 F.2d at 474 (where some evidence was "consistent" with the movant's version of the facts, summary dismissal was inappropriate because "the record as a whole contain[ed] evidence from which a factfinder, drawing all permissible inferences in favor of [the non-movant], might reasonably conclude that" the non-movant's version of the facts was accurate).[11]

Plaintiffs' claim that Defendants intentionally submitted false claims or created false documents (31 U.S.C. §§ 3729(a)(1), (2) (now §§ 3729(a)(1)(A), (B)); N.Y. Fin. Law §§ 189(1)(a), (b)) survives summary judgment.

**(4) Reverse False Claims**

■ Defendants argue that Plaintiffs' claims "brought under the reverse false claims provisions of the FCA and the NYCFA [31 U.S.C. § 3729(a)(7) (prior to May 20, 2009); 31 U.S.C. § 3729(a)(1)(G)

(effective May 20, 2009); N.Y. Fin. Law § 189(1)(g) (prior to August 26, 2010); N.Y. Fin. Law § 189(1)(g), (h) (effective August 26, 2010) ] ... should be rejected, as they are redundant." (Defs.' Mem. 27 (internal citations omitted).) Defendants state that Plaintiffs rely on the same acts to substantiate the allegations that Defendants submitted "a false or fraudulent claim for payment or approval" (and created "a false record or statement") **and** "conceal[ed], avoid[ed], or decrease[d] an obligation to pay or transmit money or property to the Government." (See, e.g., Am. Compl. ¶ 124.) Defendants rely on the holding in U.S. ex rel. Taylor v. Gabelli that allegations stating a claim under 31 U.S.C. §§ 3729(a)(1), (2) cannot also form the basis for a claim under subsection (a)(7). 345 F.Supp.2d 313, 338–39 (S.D.N.Y. 2004)

Plaintiffs counter that Defendants' redundancy argument "has no statutory basis" and "is at odds with the broad intent of the reverse false claims provision of the FCA." (Ps.' Mem. 27.) Plaintiffs rely on United States v. The Health All. of Greater Cincinnati, 2008 WL 5282139, at *15 (S.D. Ohio Dec. 18, 2008), in which the court upheld a reverse false claim in the face of a motion to dismiss.

Plaintiffs' reverse false claims must be dismissed. See Gabelli, 345 F.Supp.2d at 338–39; U.S. ex rel. Davern v. Hoovestol, Inc., 2015 WL 6872427, at *9 (W.D.N.Y.

---

Constitutional privilege" is "impermissible."); United States v. Balsys, 524 U.S. 666, 718, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) ("[I]n a civil proceeding, ... an adverse inference [may] be drawn from the witnesse['s] silence on particular questions." (emphasis added)), but concludes that there are disputed issues of material fact (and disputed statements) as to whether Defendants intentionally submitted Medicare and Medicaid claims with erroneous billing codes. See Union Carbide, 77 F.3d at 682.

11. Plaintiff Ortiz's conclusions may have been "rationally based on the witness's perception." See Fed. R. Evid. 701(a); see also Union Carbide, 77 F.3d at 682; MacQuesten Gen. Contracting, Inc. v. HCE, Inc., 191 F.Supp.2d 407, 409 (S.D.N.Y. 2002) ("[T]he Court is faced with a classic case of dueling affidavits that raise hotly contested issues of fact.... As such, the Court finds that most of the claims raised in the cross-motions should be denied, and the parties should be afforded an opportunity to prove their cases at trial.").

Nov. 9, 2015); Pencheng Si v. Laogai Research Found., 71 F.Supp.3d 73, 97 (D.D.C. 2014). The same "allegations [that] state a claim under sections 3729(a)(1) and (2) [now §§ 3729(a)(1)(A) and (B)] ... cannot also form the basis for a claim under subsection (a)(7) [now § 3729(a)(1)(G)]." Gabelli, 345 F.Supp.2d at 338. "[I]f the Court were to adopt [a different] construction ..., it would mean that any time a defendant violated subsections (a)(1)(A) or (B) and received payment, the defendant would also necessarily violate sub-section (G) if it failed to repay to the Government the fraudulently-obtained payments." U.S. ex rel. Davern v. Hoovestol, Inc., 2015 WL 6872427, at *9 (W.D.N.Y. Nov. 9, 2015): see also Pencheng Si v. Laogai Research Found., 71 F.Supp.3d at 73, 97 ("[B]y this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action...."); Am. Compl., filed Nov. 12, 2014, ¶¶ 124, 131.[12]

Plaintiffs' claim that Defendants violated the reverse false claims provisions (31 U.S.C. § 3729(a)(7) (now § 3729(a)(1)(G)); N.Y. Fin. Law §§ 189(1)(g), (h)) is dismissed.

### (5) Plaintiff's Evidence of Specific Claims

Defendants argue that Plaintiffs have not identified (i) "any specific instance in which a referring physician was substituted for another referring physician on any specific bill submitted to Medicaid"; (ii) "any specific instance ... in which a referring physician was substituted for another referring physician on any claim submitted to Medicare"; or (iii) any "specific in-

stance in which a [rendering] radiologist was misidentified on a claim directed to Medicaid." (Defs.' Mem. 14 n.8, 19 (emphases omitted).)

In response, Plaintiffs contend that (i) Defendants' counsel stipulated before Magistrate Judge Barbara C. Moses that "[t]he Mt. Sinai outpatient radiology Billing Department submitted claims to Medicaid that identified Drs. Jaime Lopez–Santini and David C. Thomas, as the referring physicians when the referral was provided by a different attending or teaching physician." (Hr'g Tr. before Magistrate Judge Moses, dated Aug. 18, 2016, at 49:25–50:5.) Plaintiffs fail to respond to Defendants' assertion that Plaintiffs have not identified "any specific instance ... in which a referring physician was substituted for another referring physician on any claim submitted to Medicare"; or any "specific instance in which a [rendering] radiologist was misidentified on a claim directed to Medicaid." (See Ps.' Mem. 13 n.7.)

Defendants have conceded that there were some instances in which a referring radiologist was misidentified on a claim submitted to Medicaid. "[T]he Mt. Sinai outpatient radiology Billing Department submitted claims to Medicaid that identified Drs. Jaime Lopez–Santini and David C. Thomas, as the referring physicians when the referral was provided by a different attending or teaching physician." (Hr'g Tr., dated Aug. 18, 2016, at 49:25–50:5.) Defendants' stipulation—at the summary judgment stage—supports Plaintiffs' argument as to this issue. See RSUI Indem. Co. v. RCG Grp. (USA), 890 F.Supp.2d 315, 326 (S.D.N.Y. 2012) (where "there are

---

12. Plaintiffs' reliance on Greater Cincinnati, 2008 WL 5282139 is misplaced. The issue in that case was whether "[a] defendant can be liable for concealing the obligations of another," id. at *15, not whether the same allega-

tions can support claims under §§ 3729(a)(1), (2) (now §§ 3729(a)(1)(A) and (B)) and § 3729(a)(7) (now § 3729(a)(1)(G)), Gabelli, 345 F.Supp.2d at 338.

facts among those stipulated by the parties to generat[e] a triable issue," "[t]here is sufficient evidence within the record to prevent a grant of summary judgment"), aff'd, 539 Fed.Appx. 3 (2d Cir. 2013).

 At the same time, Plaintiffs have submitted no proof of an actual claim that Defendants either misidentified referring radiologists to Medicare or rendering radiologists to Medicaid. See U.S. ex rel. Quinn v. Omnicare Inc., 382 F.3d 432, 440 (3d Cir. 2004). "Without proof of an actual claim, there is no issue of material fact to be decided by a jury." Id.; see also U.S. ex rel. Aflatooni v. Kitsap Physicians Serv., 314 F.3d 995, 1002 (9th Cir. 2002) (A relator must "come to court with a claim in hand or with sufficiently detailed circumstantial evidence to establish that the defendant actually submitted a false claim."). Therefore, the Court dismisses Plaintiffs' claims that Defendants misidentified referring radiologists to Medicare and rendering radiologists to Medicaid. See Quinn, 382 F.3d at 440; Aflatooni, 314 F.3d at 1002.

## IV. Conclusion & Order

For the reasons stated herein, Defendants' motion for summary judgment [# 195] is granted in part and denied in part. Plaintiffs' claims that Defendants intentionally submitted false claims or created false documents (31 U.S.C. §§ 3729(a)(1), (2) (now §§ 3729(a)(1)(A), (B))); N.Y. Fin. Law §§ 189(1)(a), (b) by using a "cheat sheet" to switch rendering radiologists' names on Medicare claims and to switch referring radiologists' names on Medicaid claims, and by submitting erroneous billing codes on Medicare claims, survive summary judgment.

Plaintiffs' claims that Defendants submitted false claims or created false documents (31 U.S.C. §§ 3729(a)(1) (now §§ 3729(a)(1)(A), (B)); N.Y. Fin. Law §§ 189(1)(a), (b)) by misidentifying rendering radiologists' names on Medicaid claims and referring radiologists' names on Medicare claims, and that Defendants violated the reverse false claims provisions (31 U.S.C. § 3729(a)(7) (now § 3729(a)(1)(G)); N.Y. Fin. Law §§ 189(1)(g), (h)), are dismissed.

Oral argument on Defendants' motion is not necessary. The parties are directed to appear before the Court on Monday, June 12, 2017 at 9:30 a.m. for a settlement conference with principals.